### George H. Clowes

60  179<br>64  701

*v.*

### Charles Miller et al.

[Filed October 11th, 1900.]

1. Complainant and the administrator of his deceased partner organized a corporation to continue the partnership business under the partnership name, and agreed that complainant should have an option of purchasing certain preferred stock on or before January 1st, 1901, and that such stock could be transferred on consent of both parties. The administrator, with consent of complainant, transferred the stock to defendant, subject to complainant's option to purchase it. The directors of the corporation called a meeting to change the name of the corporation, and complainant filed a bill to restrain defendant from voting such preferred stock, on the ground that the change of name was being made to affect the value of the stock and prevent him from exercising his option.—*Held,* that complainant was not entitled to an' injunction, since he could protect his interest by exercising his option to purchase.

2. Where complainant and R. organized a corporation, and by agreement placed certain shares of stock in the hands of a trustee until divided between them, R. to have the right to direct the vote of such stock until the division, and R. transferred his interest, with complainant's consent, to defendant, the trustee, after such transfer, had an absolute right to vote the stock as a necessary incident to its legal ownership, and such agreement was valid, and not objectionable as contrary to public policy; but such agreement did not give R. the right to direct the vote of the stock after he had transferred his interest, since an irrevocable power to direct the vote of corporate stock cannot be vested in a person who has no interest in it, and who does not represent persons who are interested; but such transfer did not confer on defendant the right to direct the vote of the stock, since the privilege was personal to R.

3. In such a case complainant was entitled to an injunction to restrain defendant from directing the vote of the stock, since by its transfer to defendant the absolute right to vote it passed to the trustee.

4. R., by consent of complainant, having transferred his interest to defendant before the date set for division, such transfer did not entitle complainant to a division of the stock on the ground that the trust had expired by limitation.

On application for preliminary injunction heard on bill and affidavits and answering affidavits.

Complainant and one Edward F. Randolph, who died in December, 1898, had from 1886 carried on as partners a manufacturing business in Waterbury, Connecticut. The business was conducted under the firm name of Randolph & Clowes, and after the death of Randolph, the complainant, as surviving partner, continued the business under the same name, until the transfer of the assets, business and good will of the firm, on or about August 1st, 1899, to a company organized under the laws of this state by the complainant and Obadiah Randolph, the administrator of the deceased partner, for the purpose of taking over the property, and continuing the business of the firm. The corporate name adopted was "The Randolph-Clowes Company."

At the time of the transfer the firm owed to creditors other than the deceased partner, Randolph, about $300,000, nearly all of which was incurred before Randolph's death, and Randolph, who had originally contributed the entire money capital of the firm ($75,000) was a creditor for further money advanced to the extent of nearly $500,000, besides a claim for interest thereon amounting to $375,000. The arrangement for transfer of the assets of the firm made between complainant and the administrator, included a provision for the issue of stock in the amount of $800,000 in payment, and an ultimate division of the stock, which should also be a settlement of any claim of the administrator against the complainant, and it also included a transfer to the new company of the stock and assets of the Calcium King Lamp Company, a company owned or controlled by the complainant alone, but which was indebted to the firm for a large sum. The formal proceeding adopted for the purpose of making the sale was a written proposal or offer to sell made by the complainant individually and as surviving partner, to which offer the administrator annexed his consent. This offer was dated July 31st, 1899, and was accepted by the company on the same date. On August 1st, 1899, the day following the proposal to sell and its acceptance, and before the issuance of the stock to be received in payment, complainant and the administrator executed an agreement in reference to the disposition of the stock to be issued (being $400,000 preferred and $400,000 common stock), by which it was provided that three

Clowes v. Miller.

thousand seven hundred shares of the preferred stock was to be issued to the administrator, and to Clowes, the complainant, or to his order, three hundred shares of preferred stock and one thousand two hundred and fifty shares of the common stock. The remaining two thousand seven hundred and fifty shares of the common stock were by the agreement,

"to be issued to the Corporation Trust Company of New Jersey, as trustee, which stock is to be held by the said Corporation Trust Company as trustee, until January 1st, 1901, unless sooner disposed of by the consent of both parties hereto, or their legal representatives, and said stock so held in trust is to be voted on at all elections or other meetings, as directed by the administrator until that date."

By the agreement the administrator also agreed to sell to the complainant, or to such persons as he might procure to purchase and pay for the same, the preferred stock issued to the administrator for $300,000, provided the sum should be paid on or before May 1st, 1900, the administrator agreeing to deliver five shares of stock (par value, $100) for every $400 paid him, and that if the complainant did not purchase or pay for all of such stock by May 1st, 1900, the administrator would sell the preferred stock then remaining in his hands to Clowes, or such persons as he should procure to purchase the same, at any time before January 1st, 1901, for ten per cent. additional.

As to the two thousand seven hundred and fifty shares of common stock to be issued to the trust company, to be held until January 1st, 1901 (the time of expiration of complainant's options), it was further provided that

"if the preferred stock issued to the administrator is sold and paid for according to the terms of this agreement before January 1st, 1901, the 2,750 shares of the common stock are to be transferred to the said Clowes, and if the said administrator's preferred stock is not so sold and paid for on or before January 1st, 1901, there are to be transferred by the said Corporation Trust Company, as trustee, to the said Clowes, or his legal representatives, 1,875 of the said shares, and the remaining 875 of the said shares are to be transferred by the said Corporation Trust Company as trustee, to the said administrator, his successors or assigns."

On August 8th, 1899, complainant individually and as surviving partner, and the administrator, united in a written request

and directions to the company, that the stock issued in payment for the property transferred should in the first instance be issued three thousand seven hundred preferred stock to the administrator, two hundred and fifty preferred stock to Charles Miller, fifty preferred stock to one Goss, one thousand two hundred and fifty shares of common stock to the complainant, and two thousand seven hundred and fifty shares of common stock "to the Corporation Trust Company of New Jersey, as trustee," and the stock was so issued. On September 5th, 1899, a tripartite agreement was made between the company, the administrator and the defendant Miller, by which Miller agreed to advance to the company $300,000 for the purpose of paying the indebtedness of the firm which the company had assumed, the sum so advanced to be secured by a mortgage upon the property of the company, and also to pay to the administrator for

"his 3,700 shares of preferred stock and his interest in the 2,750 shares of common stock held by the trust company, the sum of $100,000, taking said stock subject to all the conditions of the agreement dated August 1st, 1899, between Clowes and the administrator (a copy of which was annexed), $40,000 to be paid in sixty days, $30,000 in four months, and $30,000 in six months from date, evidenced by notes, upon the delivery of which notes the administrator agrees to deliver the 3,700 shares indorsed in blank, and an assignment of all the right, title and interest of the administrator in the 2,750 shares of common stock, the 3,700 shares to be pledged as collateral for the notes."

The three thousand seven hundred shares of preferred stock issued to the administrator have been delivered by him to Miller and transferred on the books of the company to the defendant Charles Miller, who is also the owner of two hundred and forty-nine shares additional of preferred stock and one share of common stock. The directors of the company, seven in number, and including the defendant Miller and the complainant, subsequently took the initial steps looking to a change of the name of the company, under the twenty-seventh section of the Corporation act (*Rev. of 1896; P. L. of 1896 p. 285*), and on February 13th, 1900, the directors adopted a resolution to change the name of the corporation from the Randolph-Clowes Company to the Connecticut Brass Company, or some other name, and called a meeting of the stockholders to vote upon the change of

name.   The statute provides that such .change may be made upon the vote and written assent in person or by proxy of two-thirds in interest of each class of stockholders having voting powers.   Complainant's bill alleges that the name of the company is a valuable asset of its business, which will be materially injured by the change, and that the object of the change is to affect the value of the stock so as to prevent his exercise of his option to purchase the preferred stock and to render the common stock valueless.

Complainant is now the owner of one thousand and ninety-five shares of the common stock and claims that under the agreement of August 1st, 1899, he is also the owner of at least one thousand eight hundred and seventy-five shares of the common stock, which is to be delivered on January 1st, 1901, if the options to purchase the preferred stock are not exercised, and that these shares together constitute more than one-third of the common stock.

The Corporation Trust Company, which is made defendant as trustee, intends, as is alleged in the bill, to vote at the stockholders' meeting for the change of name upon the direction of the defendant Miller, who intends to so direct.   An injunction is prayed restraining the trust company, until January 1st, 1901, from voting on the two thousand seven hundred and fifty shares to change the corporate name, and also until the same time to restrain the defendant Miller from voting on the preferred stock for such change.   Defendants' answering affidavits set up that by reason of the bad credit of the firm a change of name is advisable for business reasons, and that the change .is proposed solely in the interest of the company, and not for the purposes of injuring complainant.   No answer was filed formally setting up defendant Miller's claim in reference to his rights as assignee of the administrator to direct the vote of the trust company, but at the hearing this right was claimed, and the application should therefore be considered and disposed of as affecting such claim.   The trust company does not appear on the application, although duly notified.   The administrator is not a party to the suit.   On the hearing the complainant also claims (1) that under the agreement the right to direct the voting by

the trust company is personal to Randolph, the administrator, and cannot be exercised by his assignee, and (2) that by the administrator's sale of his share or interest in the stock held in trust the administrator has dissolved the "voting pool," and the trust company is bound to deliver to the complainant at once the one thousand eight hundred and seventy-five shares of the common stock. Upon the part of the defendant Miller it is claimed that the right to direct the vote upon all of the stock held in trust passed to Miller as his assignee, and that the change of name, being a matter of business management, the court will not interfere to control the *bona fide* exercise of the power of the stockholders and directors and substitute its own judgment therefor.

*Mr. Allan McDermott* and *Mr. Willard C. Fisk,* for the complainant.

*Mr. Mahlon Pitney* and *Mr. Warren* (of the New York bar), for the defendant Miller.

EMERY, V. C. (after statement of facts).

The directors and stockholders of a corporation are expressly authorized by the statute to change the name of the corporation, and such change of name is ordinarily, if not always, a pure matter of internal business management, which they are entitled to control, and a subject upon which the court will not undertake to substitute its judgment for that of the directors and stockholders. The only basis for such interference on behalf of a stockholder would be, as it seems to me, the existence, under special circumstances, of a right, legal or equitable, in such stockholder, to the continuance of the existing name, together with such a threatened interference with such right as could be remedied only by the action of this court. No such right was expressly reserved to the complainant in the present case by the agreement which is the sole basis of his claim, nor can any such right be implied. The complainant having the right under the agreement to purchase the preferred stock at any time before January, 1901, may, by such purchase, control

Clowes *v.* Miller.

the change of name, and in the absence of any express provision of the contract qualifying the ordinary rights of the administrator or his assignee, as holder of the preferred stock pending the option, the court will not interfere to control the vendor's exercise of such right. It certainly should not interfere where, as here, the matter sought to be controlled by the decree of the court is a matter of business management in which the defendants are not clearly shown to be acting in bad faith.

The complainant is not, under these circumstances, entitled to the aid of this court to give him a control of the preferred stock, pending his option to purchase, which is not given him by the contract, and which he may at any time secure for himself by carrying out the contract of purchase. The application to enjoin Miller from voting on the preferred stock for a change of name must therefore be denied. The principal question argued was as to Miller's right to direct the trust company to vote the entire stock held in trust in favor of such change.

The deposit in trust in this case was not simply a deposit for voting or "voting trust," but was in substance a deposit in trust for a limited period made by two persons who, at the time of the deposit, had, by reason of their agreement, for sale, with the company, a joint undivided interest in the two thousand seven hundred and fifty shares of common stock to be issued by the company.

The trust agreement provided for the ultimate division of the stock by the trustee between the parties so jointly interested, on January 1st, 1901, in the proportion and the manner fixed by the agreement.

The acceptance of the stock for these purposes of ultimate disposal by the trustee constituted a valid trust, and, in the absence of any provision in the trust agreement, the trust company, pending the execution of the trust, would have a voting power on the stock, which right it would be under obligations as trustee to exercise for the benefit of the *cestuis que trustent,* according to its own best judgment. And, so far as the trust agreement has not deprived the trust company of this power and obligation by a valid and continuing restriction,

this power must still inhere in the trust company itself as a necessary incident to the legal ownership of the stock.

The provision of the agreement that the stock held in trust was to be voted at all elections and other meetings, as directed by the administrator, until January 1st, 1901, was, in view of the character of the entire transaction, as part of a transaction for the sale of the stock and a settlement of partnership affairs, a valid provision, and not objectionable on any grounds of public policy. *Hey* v. *Dolphin, 36 N. Y. Sup. 627 (1895)*, and cases cited at *p. 632; Chapman* v. *Bates, 46 Atl. Rep. 591 (Vice-Chancellor Pitney, 1900)*.

But, so far as the administrator's personal right to direct the vote was concerned, the agreement could not be valid for the purpose of securing the control of the voting on the trust stock to him personally, if he did not continue to be an owner of the stock or interested in the stock.

It is against the settled rules governing the control of corporations that an irrevocable power of voting or directing the votes on stock should be vested in a person who is neither interested in the stock nor a representative of persons interested. *White* v. *Thomas Inflatable Tire Co., 7 Dick. Ch. Rep. 178,* and cases cited at *pp. 183, 184 (Vice-Chancellor Pitney, 1893)*.

This agreement, therefore, so far as it expressly authorized Randolph to direct the vote, is not valid for the purpose of continuing such a power of direction in Randolph personally after the transfer of his entire interest in the stock of the company. And so far as the express provisions of the trust agreement extend to affect the right of voting inherent in the trust company by virtue of the legal ownership of the stock, it must be held that so far as Randolph personally is concerned, it ceased to extend or operate upon his transfer of his entire interest in the stock, and that Randolph has no longer the right to direct the vote. The question is whether Miller, as the assignee of all of Randolph's interests, has succeeded to this right of Miller's. I do not think he has. The common stock held in trust was, by the terms and method of the purchase from the company, owned by the complainant and the administrator jointly, and the deposit of this stock in trust was a joint act of deposit with a pro-

vision for ultimate division between them and a separation of their joint interest. Had the stock been issued to them jointly, the concurrence of both would have been necessary to a vote on the stock. *3 Thomp. Corp. Off. § 3871.*

The provision giving Randolph the direction of the trustee's vote pending the trust was, in my judgment, and under all the circumstances of the case, intended as a personal authority to him pending the trust, and was not intended to be attached to the owner or owners of his interest in the eight hundred and seventy-five shares of the two thousand seven hundred and fifty deposited.

The privilege certainly is not connected with the ownership of the preferred stock, for this may be separated from the right to the common stock, and the inference of intention should be very clear in order to justify the conclusion that the agreement intended to confer on any owner or owners of eight hundred and seventy-five shares a right to direct a vote upon the whole two thousand seven hundred and fifty which was given in terms only to Randolph himself, and was not expressly extended to his assigns. My judgment is that the authority to direct the vote was personal to Randolph, and that he having now by his sale incapacitated himself from giving the direction, the trust company itself, as the legal holder of the stock, has the right to vote the stock without being bound absolutely under the agreement by the direction of either the complainant or Miller, and it must exercise this right and power honestly and in its best judgment as trustee, giving such weight as in its judgment it is entitled to, to the fact that the complainant, the owner beneficially interested in the majority of the stock held in trust, is opposed to the change.

Irrespective of the omission in the agreement of any express provisions as to the right to direct the trustee's vote on the whole stock following the assignment of Randolph's interest alone in the minority of the stock, there are serious practical difficulties in the way of holding that this right to direct the vote on the whole stock follows the assignment of Randolph's eight hundred and seventy-five shares or his interest therein. These may be assigned to different holders, and if so, to whom

does the right of direction of the trustee's vote go; to the holders of the majority, or to all the holders jointly and not otherwise? Manifestly such contingencies should be provided for in the trust agreement itself, if the trustee's legal right to vote is to be controlled thereby, and in many instances of trust agreements there are such express provisions where, by the issuing of trust certificates and other machinery, the holders of certificates as the equitable owners of the stock, are to a certain extent given, as against the trustee, rights analogous to those of legal shareholders. These rights in the ultimate equitable owners to direct the voting as against the legal holder and trustees, are the result, however, of express provisions in the trust agreement or necessary implications from its provisions. But where, as here, there are no provisions, either expressly or by necessary implication, continuing the control or direction of the voting powers over the whole stock in the assignee or assignees of the minority of the stock, the provision as to the direction of the vote must be held to be personal in the appointee, and to have now become unlawful for him to exercise, because he has no interest either in the stock to be voted or the preferred stock. The power thus given to Randolph having failed, there is no provision in the agreement which will deprive the trustee of the power or relieve it from the obligation of voting on the stock as trustee.

As such trustee, however, the trust company, will not be entitled to vote merely as directed by Miller, and in view of Miller's claim to this right to direct the vote, and the failure of the trust company to disclaim its intention to be directed by Miller, a preliminary injunction will be advised enjoining the trust company, until answer or further order, from voting on the trust stock under the direction of Miller, and enjoining Miller from giving such directions. The trust company, however, will not be enjoined from voting as trustee on the question of a change of name.

As to the contention of the complainant that, by reason of the administrator's sale of his stock, the "voting pool" is destroyed and complainant is entitled at once to his one thousand eight hundred and seventy-five shares of stock, it must be observed that the trust agreement is not simply a deposit for the pur-

Clowes *v.* Miller.

pose of voting, but is a trust to hold the stock for a limited period, to await the result of certain options of purchase, which affect the ultimate disposal of the stock. The transfer of the subject of sale (the preferred stock) by the administrator, put it out of his power personally to carry out the contract, and might, perhaps, give the vendee the right to consider the contract rescinded, and the trust terminated except for the division of the stock. Upon this point, however, I express no opinion, because, even if it be well taken, yet it was clearly in the option of the complainant to consider the contract of sale as in force, and to consider the right to purchase the preferred stock as continuing against the purchaser Miller, who purchased not only with notice of the agreement of sale, but expressly subject to its provisions. The bill in this case is filed on the basis of a continuance of the contract to purchase the preferred stock and its continuing validity against the defendant Miller, and the continuance of the trust in the trust company to hold the stock pending the expiration of the option. On this bill, therefore, it cannot be held that the trust has been extinguished by the sale to Miller, or that the complainant, who has not treated the sale to Miller as a rescission, is now entitled to a division of the stock as on the expiration of the trust by limitation.

The case being one in which the defendant is entitled to a speedy hearing on appeal, the preliminary injunction, to the extent above indicated, will be directed on the condition that, if the defendant appeals within ten days after the order, complainant shall consent to have the appeal brought on for hearing at the next term of the court of errors and appeals.